FILED
JAN 3 0 2006
NANCY MAYER WHITTINGTON, CLERK
U.S. DISTRICT COURT

United States District court
Washington, D.C.

Betty Ann Newby,

    Plaintiff,

vs.

President George W. Bush, et al

CASE NUMBER 1:06CV00160

JUDGE: Royce C. Lamberth

DECK TYPE: TRO/Preliminary Injunction

DATE STAMP: 01/30/2006

## Motion for a Temporary Restraining Order

To the Honorable Judge of the Court:

    Plaintiff Betty Ann Newby files her MOtion for a Temporary Restraining Order and shows the Court as follows.

### I.

    Betty Ann Newby learned from a credible government employee that President George H. Bush authorized clandestine, warrantless surveillance of her beginning in approximately 1990 as a favor to officials at Phillips Petroleum Company, Locke Purnell Rain Harrell, P.C., and George Whittenburg, III, Esq. because of her aggressive litigation of federal class action suits seeking CERCLA response costs and damages from corporate Phillips and the Whittenburg heirs over the forced relocation or residential Phillips. Chemical and substance pollution from corporate PHillips' nearby facilities located on lands formerly belonging to the Johnson and Whittenburg heirs posed serious public health risks to local residents and had done so for decades. The response costs pursuant to the Superfund Act and damages pursuant to state and federal law exceed one billion dollars.

President Bush's lawyer's firm in Dallas represented corporate Phillips for over 14 years in the class action litigation. Plaintiff has also aggressively litigated against the City of Borger, Texas and corporate Phillips on other matters, including cheating the E.P.A. out of three million dollars and lying about its ad valorem tax renditions. During the class action litigation, plaintiff and her clients caught corporate Phillips and its lawyers from Lock Purnell Rain Harrell, P.C. (now known as Locke Lidell & Sapp, LLP) and corporate counsel intentionally burning and burying truckloads of protected environmental documents and bribing the federal judge and judges in the Fifth Circuit. They attempted to bribe plaintiff. When she refused their offer and continued the litigation, they were responsible for the City of Borger's agents destroying by bulldozing and crushing plaintiff's home, car, 2 historic properties, and her late brother's home from information obtained from Homeguard Security personnel. The Homeguard surveills domestically without warrants in cooperation with the military for the executive branch. Plaintiff has and has never had any association or contacts with any terrorists. She is a certified secondary teacher and practiced law for twenty years in Borger, Texas before agents for Borger, Locke-Purnell, and George Whittenburg, III persuaded the State bar to suspend her from the practice of law. This was accomplished without Due Process and jurisdiction.

The government employee who "blew the whistle" on the illegal surveillance operation to plaintiff told her that young lawyers for the government had provided the legal scholarship for the Reagan-Bush administrations in the 1980's.

On January 9, 2006, a journalist for the New York Times wrote that Alito and Roberts were both young Republican lawyers who worked for the executive and found ways to advance a conservative agenda for the executive office. The article states that they were such good friends and thought so much alike that they often finished each other's sentences in conversations. Plaintiff attended the Alito hearing. She asked various Senators to ask Justice Samuel Alito to produce his legal scholarship regarding his role in advising the executive office whether to surveil without warrants a number of American citizens who were not terrorists and who posed no threat to the national security. When the Senators learned that plaintiff was not a D.C. resident, they were not interested because she was not a constituent or voter from their districts. Plaintiff is now a D.C. resident and has no Congressional delegation.

Betty Ann Newby delivered a written request to Senator Alan Specter asking him to subpoena Alito's scholarship as a government lawyer regarding illegal domestic surveillance and require his testimony. She asked in the alternative for him to allow her to do so. She also

3.

asked in the alternative for Congress to pass a statute allowing D.C. voters to have a Congressional delegation and allow her new Senators to ask Justice Alito the questions and demand production. The Chairman of the Judiciary Committee refused her requests. Subsequently, the Judiciary Committee approved Justice Alito with no questions about his role in advising President Ronald Regan regarding warrantless surveillance operations by the government.

During the John Roberts' confirmation hearings, President George W. Bush refused to produce Roberts' scholarship citing executive privilege. Since that time, the New York Times reported wide-spread warrantless domestic surveillance by the executive. Plaintiff filed a timely appeal from the District Court's denial of relief in her challenge to the Roberts' confirmation on Due Process grounds. However, the facts are different requiring this Court to enter an immediate temporary restraining order to enjoin the Senate from voting on the motion for cloture filed by Senator Bill Frist seeking to halt all debate on the Alito nomination and expected to be decided by vote on January 30, 2006.

In the Alito confirmation, plaintiff had recent evidence in all likelihood linking both Roberts and Alito to the surveillance operations by the January 9, 2006, article, coupled with the government employee's description of the young lawyers involved in such questionable operations. IN

3.

the interest of justice, she asks the court to enjoin further Samuel Alito proceedings for judicial office until the courts can resolve plaintiff's Constitutional challenge that current Senate rules deny her representative government and privileges and immunities guaranteed by Article IV of the Constitution; they also deny her Due Process under the Fifth Amendment and her First Amendment right of association and to petition the government for redress of grievances. Federal law does not currently allow her or the minority Senators on the Judiciary Committee the right to seek judicial imposition of Contempt of Congress to challenge a recalcitrant witness. Further, the murder boards run by the Justice Department actually take away the senate Committee's investigative powers by programming and coaching the candidates which questions to answer and which ones not to answer. They are not a part of the Senate Rules or relevant confirmation law and arguably tread on subornation of perjury issues. They are unfavored in a democracy and should be held unConstitutional. As ahown above, a likelihood exists that plaintiff will prevail on the merits. Justice sponsors her request to be allowed access to the political process of judicial selection of federal judges as an incident of American government and civic responsibility. She has an interest in the confirmation of the justices because their rulings will, in all likelihood, affect her life, liberty, and property. She has no adequate remedy at law. She is willing to post

4.

security for a restraining order or injunction.

There is inadequate time to serve the defendants and conduct a hearing before the Senate will vote on cloture and the confirmation of Justice Samuel Alito before the plaintiff and the public can learn his morals and scholarship and legal philosophy as revealed in any scholarship involving warrantless surveillance of innocent Americans such as plaintiff who advocates for her clients in civil rights and environmental suits and who challenges judicial bribery and fraud in high places.

Plaintiff asks for a temporary restraining order that will:

1. Enjoin or restrain Senator Bill Frist from obtaining a vote on cloture to halt debate on the Alito confirmation until the Court can conduct a hearing on plaintiff's motion and Complaint seeking injunctive relief for constitutional infirmities in the Alito and Roberts' confirmation proceedings;

2. Enjoin President of the Senate Ted ~~Andrews~~ Stevens from proceeding with Alito confirmation procedures until this court can conduct a hearing on this motion and the parties can be served and file answers and resolve the Constitutional matters;

3. Enjoin any Alito proceedings by Senator Alan Specter as Chairman of the Judiciary committee until the Court can resolve plaintiff's request and challenge to the lack of procedural Due Process safeguards for herself as one of

5.

370,000 D.C. voters who are unable to participate directly or through a representative regarding judicial appointments to the federal bench.

Plaintiff asks the court to require Senator Alan Specter to comply with her requests as set forth in her letter a copy of which is attached and incorporated with this motion as is the NY Times January 9 2006, article. after hearing on this motion.
Plaintiff asks for immediate equitable relief in the interest of justice and for no other reason.
Plaintiff's Declaration is attached and incorporated.

Respectfully submitted,
Betty Ann Newby
pro se
425 2nd St. NW D.C. 20001

Declaration
"My name is Betty Ann Newby. I am the plaintiff. I am over 21 years of age and am competent to make this Declaration. The facts are true and correct and are based upon personal knowledge unless otherwise stated.
I amke this Declarationunder the pains and penalties of perjury on January 30, 2006.
Washington, D.C.

6

THE REAGAN LEGACY

# Two Legal Careers That Diverged May Intertwine Aga[in]

By DAVID D. KIRKPATRICK

WASHINGTON, Jan. 8 — Not long after the inauguration of President Ronald Reagan in 1981, two young lawyers moved into cramped offices along the same hallway on the fifth floor of the Justice Department's headquarters.

One, Samuel A. Alito Jr., 30, was hired as a nonpolitical career lawyer. Promoted from the office of a New Jersey prosecutor, he quietly drafted Supreme Court briefs in the solicitor general's office. Former colleagues describe him as shy and serious, prone to spending long hours buried in case files. Charles Fried, the Reagan administration solicitor general, remembers Mr. Alito as "a very cultured man" who was more likely to spend their lunches together talking about books and ballet than politics.

The other, John G. Roberts Jr., 25, arrived fresh from a clerkship for Justice William H. Rehnquist of the Supreme Court, and entered the department a rung higher than Mr. Alito, as a presidential appointee assisting the attorney general on a variety of matters. Mr. Roberts was handsome and funny, former colleagues say, and hard not to like.

A quarter-century later, their contrasting styles will be on display again this week in the Senate hearings on the Supreme Court nomination of Judge Alito, now on the Court of Appeals for the Third Circuit. But Chief Justice Roberts had the more political job then; it is now Judge Alito who faces more political opposition, in part because of statements he made in 1985 to persuade the administration's leaders that he, too, was a conservative at heart.

To many of their former colleagues, the ascent of both men to the Supreme Court within months of each other would be the high point of a conservative revolution in the legal establishment: an effort over several decades to seed the federal courts with jurists holding a narrow interpretation of the Constitution's application to abortion rights, civil rights, the rights of criminal defendants and the scope of federal power.

"It is the culmination," said Edwin Meese III, who was attorney general in the Reagan administration and a leading architect of the movement.

"Judge Alito and Chief Justice Roberts represent the best among the group of excellent young lawyers that came into government at the same time in the Reagan administration."

They worked together only occasionally at first, colleagues said. Mr. Roberts's job entailed tracking prominent or politically sensitive cases for the attorney general, which sometimes meant checking with Mr. Alito on his work, their colleagues said. But they came together much more often in 1985, when Mr. Alito was elevated to a political job in the Office of Legal Counsel. Mr. Roberts was an associate White House counsel. The Office of Legal Counsel acted as a kind of in-house law firm evaluating pending legislation and interpreting statutes for the White House counsel, so Mr. Roberts was in effect one of Mr. Alito's clients.

"We might walk into each other's offices and say, 'Did you get John Roberts's call about such and such?'" recalled Douglas W. Kmiec, a law professor at Pepperdine University who worked in an office adjoining Mr. Alito's and knew both men.

Former colleagues say their shared intellectual framework could make for an unusually close collaboration on the court. "The way that with a good friend you don't start each sentence anew, you start it in midsentence, that would be the relationship between John and Sam," said Professor Kmiec (pronounced kih-MECK).

Some Democratic lawyers argue, however, that the similarity of the men's backgrounds may be a liability, too. "Some senators might well conclude that the fact that one nominee is so similar to the immediate previous nominee is an argument against confirmation," said Walter E. Dellinger III, who was acting solicitor general in the Clinton administration. "Some might say, send us someone a little different."

But friends and colleagues of Chief Justice Roberts and Judge Alito say the two jurists' careers before and after the Reagan administration have followed very different paths, reflecting their personalities. Although both graduated from law school with sterling credentials — Mr. Alito was an editor of the law review at Yale and Mr. Roberts at Harvard — the chief justice followed an appeals court clerkship with his clerkship for Justice Rehnquist.

Mr. Alito moved back to New Jersey after law school to clerk for Judge Leonard I. Garth of the Court of Appeals for the Third Circuit, who had also worked closely with his father, a researcher for the New Jersey Legislature, and he stayed in the state to become a federal prosecutor.

In the Reagan White House, Mr. Roberts's conservative bona fides as a former Rehnquist clerk were already well-established. But Mr. Alito's were not.

"Sam was not like me, and most of the other political appointees, who were known-quantity Reagan conservatives," said Charles J. Cooper, the administration lawyer who in

## A potential reunion, of sorts, on the Supreme Court.

1985 recruited Mr. Alito to a political job in the Office of Legal Counsel.

Mr. Cooper said he had begun to see that Mr. Alito was "simpatico" with the administration's goals from some of his work, including a recently disclosed memorandum proposing legal tactics to curb or end abortion rights. But for his promotion, "His political views, his thoughts concerning the administration's legal direction, had to be made known to the president's personnel office," Mr. Cooper said.

Thus as part of his application, Judge Alito was obliged to write a short essay spelling out his convictions about the conservative movement's legal approach to the Constitution, abortion rights, affirmative action and other matters. Democrats contend that, unlike any of the briefs or memorandums Chief Justice Roberts wrote for Republican administrations or clients, Judge Alito's essay provides a window into his personal view of the Constitution, and they now plan to make it the centerpiece of their questions for him in the hearings.

After the two left the administration, their careers diverged sharply. In 1986, Mr. Roberts left the administration to work in Washington as a private lawyer among the elite ranks of the Supreme Court bar. Mr. Alito, in contrast, surprised some of his colleagues by leaving the capital.

"Sam's main interest when he was to raise his kids in his home state and the area where he grew up," Mr. Cooper said. "He wanted go back to New Jersey first." It was only later that Mr. Alito settled on a position as United States attorney, Mr. Cooper said.

"John's progression was one that people would expect from the script — he is in the Beltway, he stays in the Beltway, and he takes his skills to very profitable firm," Professor Kmiec said, but Judge Alito's return to New Jersey was not. "I would look at him with a bit of an arched eyebrow and I'd say, 'I don't get it.'"

His former colleagues said Judge Alito passed up an opportunity to make much more money by spending his whole career as a federal employee. And his 15-year tenure on the bench has left his opponents with far more judicial opinions to attack. Some liberal legal scholars contend that Judge Alito's record reveals a much more committed, less flexible conservative than do any of the opinions Chief Justice Roberts wrote during his two years as an appeals court judge. "In Roberts's opinions there were no signs of partisanship," said Cass R. Sunstein, a law professor at the University of Chicago, who publicly supported Chief Justice Roberts's confirmation. "That gave liberals a lot of comfort."

Studying Judge Alito's opinions led him to a different conclusion, Professor Sunstein said: "Judge Alito's opinions have a different flavor. He is very predictably critical of individual rights claims, and predictably to the right of the court's majority."

Still, Mr. Fried, the former solicitor general, said he had no doubt that Chief Justice Roberts also shared the same conservative views that Judge Alito laid out in 1985 memorandum.

"John is more cagey," he said, adding, "but intellectually and dispositionally there is not a dime's worth of difference between them."

FILED JAN 30 2006   06 0160   NANCY MAYER WHITTINGTON, CLERK U.S. DISTRICT COURT

January 11, 2006

Dear Chairman Specter:

Would you subpoena Judge Alito's documents, scholarship, notes, memos, briefs, e-mails, and all evidence involving his role in the executive branch's use of the Homeguard Security to perform covert, domestic surveillance, beginning in the 1980's and continuing today?

Alternatively, would you recess the Alito confirmation hearing to allow me to analyze these documents and prepare questions to ask the candidate for the thousands of Americans who have no Senator to represent them in the Alito hearing? I am a D.C. resident.

Would you recess the Alito hearing to allow the passage of a bill allowing residents of the protectorates, including the District of Columbia, to participate in democracy through Senators and Representatives like the rest of the United States? The Supreme Court is currently conducting business and no harm is done by a short delay. Justice is served by allowing all Americans to participate in our republican form of government.

To deny any of my requests is to pay lip service only to the U.S. Constitution and to make a mockery of equal rights and due process.

Yours truly,
Betty Ann Newby
425 2d St. NW
D.C. 20001

D.C. Dist. Court
DC

Betty Nuly
vs.
Pres. Bush et al                    No. _____

Certificate of Service 65.1 FRCP
I delivered a true copy of
Mot for Temp. Rest. Order to
Sens. Frist, Specter, ~~Andrews~~ Stevens
in their offices 1-30-06. for TRO.
                    Betty Nuly

T. J. — Frist
UR Arthur Stevens — ~~Andrews~~
Specter — JW

06 0160

**FILED**

JAN 3 0 2006

NANCY MAYER WHITTINGTON, CLERK
U.S. DISTRICT COURT